# THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                 No. Cr. 21-559 JH

ELOY ROMERO,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Eloy Romero's *Motion to Suppress Evidence due to Violation of the Fourth Amendment and/or after an Illegal Inventory and Impounding and Search of Mr. Romero's Vehicle* (ECF No. 26) and his *Amended Motion to Suppress Evidence due to Violation of the Fourth Amendment and/or after an Illegal Inventory and Impounding and Search of Mr. Romero's Vehicle (Amended only to modify <u>exhibit</u>)* (ECF No. 28). The latter motion was amended only to modify an exhibit. Because the initial motion has been replaced, the Court will deny Defendant's initial motion to suppress as moot and will consider herein the merits of the amended motion to suppress. This Court held an evidentiary hearing on the amended motion to suppress on November 9, 2021. On request of the parties at the hearing, the Court permitted the parties to submit written closing arguments. Having considered the motion, briefs, the written closing arguments, the evidence, and the applicable law, the Court concludes that the evidence was lawfully discovered and that Defendant's amended motion to suppress should be denied.

## I.    FACTUAL BACKGROUND[1]

---

[1] The Court finds the following facts after considering the evidence submitted and presented at the hearing.

On February 25, 2021, Albuquerque Police Department ("APD") officers were working with the APD Gang Unit on a proactive tactical operation in the Southwest area of Albuquerque related to complaints of gang activity, shootings, and stolen vehicles in the area where many hotels are located. (*See* Hr'g Tr. 9:1-9.) Approximately four or five undercover detectives driving unmarked cars were working with at least two or three uniformed officers driving marked police units, the latter of whom would contact individuals who the detectives believed were engaged in illegal activity. (*See id.* at 9:15-10:25.)

Jonathan O'Guin, an officer with 13 years of experience with APD, including receiving training on vehicle theft, was assisting in the operation by looking for suspicious activity in the motel parking lots because it is a high crime area known for drug deals, assaults, and thefts. (*See id.* at 79:11-81:5.) While on duty, O'Guin noticed a white Toyota Camry drive into the Motel 6 parking lot, circle around the parking lot twice, exit the lot, and drive across the street. (*See id.* at 81:15-20.) This behavior was suspicious to O'Guin because most drivers pulled into the lot and parked, so O'Guin relayed by radio this behavior to other officers. (*See id.* at 82:6-21.)

Officers then observed the driver of the Camry, later identified as Romero and the only occupant in the car, park near the Mariscos restaurant and crawl around under the steering column, appearing to use a flashlight to look up at the steering column. (*See* Hr'g Tr. 12:18-13:24, 81:21-82:5.) It appeared as if he might be trying to hotwire the vehicle. (*Id.* at 81:21-82:5) In Officer Guin's experience, sometimes the ignition wire may disconnect from a hotwired vehicle, or if the ignition is turned off, to restart the vehicle, the driver will again have to get the connection back together using the same hotwire method. (*See id.* at 81:21-82:5, 84:20-85:5.) Based on the officers' experience, this behavior is consistent with auto theft offenders who often damage the steering column to start the vehicle. (*See id.* at 13:25-14:18.)

Officer Albert Simmons, who was assisting the operation in a marked unit, saw the same Toyota Camry in the parking lot of Mariscos, (*Id.* at 93:25-96:13.) Based on the information relayed over the radio, Simmons likewise believed through his training and experience that the driver was behaving like someone driving a stolen motor vehicle. (*See id.* at 96:18-97:5.) Simmons had located stolen vehicles in that area many times. (*Id.* at 97:8-10.)

After observing Romero's behavior in the parking lot, Adrian Montoya, an APD detective with 19 years of experience in law enforcement, including in auto theft cases, radioed marked units to stop the car based on suspicion of auto theft. (*See* Hr'g Tr. 7:6-8:23, 14:2-15:2.) Three marked police vehicles drove up behind the parked Toyota sedan in the parking lot. (*See id.* at 15:16-24; Gov.'s Ex. 7.) As soon as the marked units activated their emergency lights and sirens, the vehicle began to drive away slowly from the officers. (*See* Hr'g Tr. 15:16-16:5, 97:18-98:4; Gov.'s Ex. 7.) The vehicle driving away from the marked units added to the officers' suspicion that the vehicle might be in the process of being stolen. (Hr'g Tr. 16:2-5, 98:5-11.) After approximately eight seconds, the marked patrol units turned off their lights and sirens, because the sergeant on scene told the marked units to disengage at that time, deeming the circumstances not to meet the criteria for APD's chase policy. (*See id.* at 16:6-12, 17:10-20; Gov.'s Ex. 7.) The marked units continued to follow the Toyota through the parking lot. (*See* Hr'g Tr. 17:19-20; Gov.'s Ex. 7.)

Simmons was in his marked patrol unit when he saw the Toyota travel east through the parking lot approaching Coors Boulevard ("Coors"). (Hr'g Tr. 98:25-99:3.) Simmons witnessed the Toyota turn south onto Coors from the parking lot, but it failed to use its right-turn signal, which Simmons believed to be a traffic infraction. (*See id.* at 99:5-20.) At that point, Simmons initiated his lights and sirens and simultaneously did a records check on the vehicle that revealed the vehicle to have a suspended registration. (*Id.* at 99:23-100:2.) Based on Simmons' experience,

when the system shows a suspended registration that is not expired, it means that there is no insurance on the vehicle. (*Id.* at 100:3-11.) Simmons' computer system did not indicate that the vehicle had been reported stolen. (*Id.* at 132:20-133:11.) However, if the vehicle was in the process of being stolen or had just been stolen, it may not have been reported stolen yet in the NCIC system, so Simmons could not confirm that the vehicle was not stolen. (*See id.* at 68:15-17, 98:12-20, 133:12-134:22, 155:17-21.)

Simmons then drove directly behind the Toyota on Coors, but the vehicle failed to pull over despite his use of lights and sirens. (*Id.* at 100:23-101:9.) Other vehicles in the heavy traffic were reacting to Simmons' lights and sirens by stopping and pulling over, but not the Toyota. (*See id.* at 101:10-102:1.) Simmons then turned off his lights and sirens for safety reasons, and backed off from the Toyota, creating a couple hundred feet of space between them, so he was no longer directly behind it. (*See id.* at 102:2-103:23.)

Detective Montoya continued to follow the car in its general direction as it traveled southbound on Coors. (*See* Hr'g Tr. 16:13-20.) Romero at that time was obeying traffic lights and not speeding. (*Id.* at 16:19-21, 103:24-104:1.) After the car passed Central Avenue, Simmons was advised to try another traffic stop, so he initiated his emergency equipment once again. (*See id.* at 104:1-13.) This time, the Toyota pulled over to the right side of Coors onto the shoulder of the road. (*See id.* at 104:13-17, 109:16-110:2.) From his initial attempt to stop Romero until the time Romero pulled over, Simmons followed Romero for a couple minutes and Romero passed several locations where he could have pulled over earlier. (*See id.* at 154:2-155:5.)

At the location Romero stopped, Coors has two lanes of traffic in each direction, separated by a median, with a 45-mph speed limit. (*See* Gov.'s Ex. 2 & 3; Hr'g Tr. 110:14-20.) The shoulder on the right-hand side of the far-right lane is approximately the width of a standard sedan vehicle,

but it is not a location designated for parking. (*See* Hr'g Tr. 109:16-22; Gov.'s Ex. 4.) A little farther south, the shoulder is used for a right-hand turn lane. (*See* Hr'g Tr. at 110:3-7.) The left side of the Toyota was approximately less than a foot from the solid line marking the edge of the right lane of travel, and it was dark with traffic common in this area at night, creating a potential safety hazard for motorists travelling southbound on Coors in the right-hand lane. (*See id.* at 111:15-115:3.)

At least five other officers in at least five police vehicles arrived to assist as they were all participating in the operation. (*See* Gov.'s Ex. 6 at 0:30-1:00; Hr'g Tr. 56:8-14, 87:12-20.) Simmons came up to the driver, explained why he pulled him over, and asked him to provide his license, insurance, and registration. (*See* Gov.'s Ex. 6 at 1:03-1:27.) Romero could not provide a driver's license, saying he only had his social security card, which he handed to Simmons. (*Id.* at 1:05-1:15.) Simmons again asked for registration and insurance, and Romero said that it was his "buddy's car." (*Id.* at 1:15-1:22.) Romero's lack of paperwork for the vehicle added to the officers' suspicions concerning the status of the car. (*See* Hr'g Tr. 19:16-22.) Moreover, the car appeared to be uninsured, so Simmons believed they would need to tow the vehicle. (*Id.* at 117:5-10, 119:8-12.) APD has a policy to tow an uninsured vehicle because no one is permitted to drive it. (*See id.* at 20:1-11.)

Montoya, who was standing with Simmons, instructed Romero to step out of the car so the officers could talk to him. (Hr'g Tr. 18:16-24; Gov.'s Ex. 6 at 1:27-1:32.) When Romero asked why because he had not done anything wrong, Montoya replied that it was because he did not stop for officers when they tried to stop him. (*See* Gov.'s Ex. 6 at 1:23-1:34.) Romero got out of the car and Simmons conducted a pat-down search of him at the rear of the vehicle. (*Id.* at 1:34-1:57.) The officers' tone was cordial. (*See id.*)

At the same time, Montoya began shining a flashlight into the open driver-side door. (*See id.* at 1:57-2:10.) He did not see any damage to the steering column. (*See* Hr'g Tr. 35:3-12, 55:25-56:6.) Montoya also looked into the back driver-side window with a flashlight while officers were explaining to Defendant why he was pulled over. (*See* Gov.'s Ex. 6 at 2:10-2:40.) Romero explained that, at first, he didn't know officers were trying to pull him over. (*Id.* at 2:10-2:19.) Romero said he was in the Mariscos parking lot to change a fuse in his car, which was under the dash. (*See id.* at 2:59-3:26.) His behavior was also consistent with how a person might change a fuse. (*See* Hr'g Tr. 87:24-88:3.) While they were still talking, Montoya opened the rear driver-side door and started looking in the rear of the car with the flashlight. (Gov.'s Ex. 6 at 2:40-2:57.) At this time, Montoya did not reach into the vehicle or touch anything inside the vehicle. (*See id.*; Hr'g Tr. 24:10-16.)

When asked if he had a driver's license, Romero said he should, but it was suspended because of child support. (*See* Gov.'s Ex. 6 at 3:34-3:46.) When asked if he had insurance and registration for the car, Romero replied that it was his buddy's car, but actually he was buying it from him, and the paperwork should be in the glovebox. (*See id.* at 3:46-4:04.) Officers asked him if he knew why they stopped him, and he replied that it was because he didn't stop, but he didn't mean anything by it. (*Id.* at 4:04-4:10.) Romero explained that he didn't know they were trying to stop him because they turned off their lights. (*Id.* at 4:10-4:15.) Officers replied that they did that after he failed to stop for them. (*Id.* at 4:15-4:16.)

Officers learned that Romero had a traffic warrant and his driver's license was suspended. (*See id.* at 4:48-5:00, 119:1-4.) An officer also informed Romero that he had a non-extraditable warrant out of Sandoval County. (*See id.* at 4:48-5:05.) At the point when he learned that Romero had no documentation for the vehicle and no driver's license, Montoya determined they should

tow the vehicle. (*See* Hr'g Tr. at 22:7-16.) Once the determination is made to tow a vehicle, police conduct an inventory search to look for items of value to note on a tow-in form. (*See id.* at 20:12-21:5, 119:21-121:7.) Officers look through the entire vehicle, including containers such as luggage, backpacks, wallets, and the trunk, when conducting an inventory search. (*See id.* at 25:19-26:4, 120:5-17.)

Montoya did not tell Romero or the other officers right away that he decided to tow the vehicle, because he wanted the situation to remain calm and to avoid conflict. (*See id.* at 56:20-57:9, 73:7-18.) Montoya opened the rear driver-side door, reached in, and touched and looked into the black backpack. (*See id.* 22:11-23:21, 58:14-25; Gov.'s Ex. 6 at 4:55-5:15.) He did not look inside the backpack until after he made the decision to tow the vehicle. (*See* Hr'g Tr. 30:2-7, 32:10-15, 58:14-25.) Montoya told Romero, "Eloy, you can't be operating this car. We could tow it right now." (Gov.'s Ex. 6 at 5:13-5:15.) Romero replied that he was just trying to get home and was trying to put the fuse in and return home. (*Id.* at 5:15-5:20.) Montoya stated that they were going to figure out what do to but that he "can't be operating this car with no paperwork, no driver's license, no nothing." (*Id.* at 5:28-5:34.) Romero responded that the car was his buddy's car, and the paperwork should be in the glovebox. (*Id.* at 5:34-5:47.) Romero offered to get the paperwork from the glovebox, but officers replied, no, because of his behavior so far, they didn't want him to reach in there. (*See id.* at 5:46-5:55.)

Montoya then informed Romero that they were going to tow the car. (*Id.* at 5:53-5:55.) When Romero asked why, Montoya responded, "Because you can't drive it!" (*Id.* at 5:56-6:01.) Montoya asked Romero, "Is this all your stuff in here in the car?" (*Id.* at 6:18-6:21.) Romero replied, "most of it, yeah" and reiterated that it was his buddy's car, and he was trying to buy it from him. (*Id.* at 6:18-6:29.) Montoya then went to the glovebox to look for vehicle documentation.

(*See id.* at 6:30-7:34; Hr'g Tr. 25:9-12.) He did not find proof of insurance. (Hr'g Tr. 25:13-15.)

While Montoya was looking for documents, Simmons asked Romero for his "buddy's" name. Defendant replied, "Isaac, uh, Isaac and Bertha." (Gov.'s Ex. 6 at 6:30-7:05.) Romero did not know their last names, saying that it started with an "O," but he was not sure. (*Id.* at 6:45-6:55.) Romero said he had been driving the vehicle for a couple of weeks and knew them pretty well. (*See id.* at 6:55-7:30.) Montoya looked around the inside of the car. (*See id.* at 7:30-8:15.) Montoya informed Romero that he was only able to locate the title for the vehicle, but no insurance. (*Id.* at 8:13-8:16.) Montoya asked Romero what he was doing with the title and opened the rear driver-side door at approximately the same time. (*Id.* at 8:13-8:26.) Romero explained that he was in the process of buying the car from his buddy. (*Id.* at 8:26-8:27.)

The title listed the name of Hector Garcia-Salas. (*See* Title, Def.'s Ex. B-C.) Neither Romero's name, nor any of the names he gave officers for the seller, were listed on the title. (*See id.*; Hr'g Tr. 72:3-10.) The registered owner for the vehicle was listed as Hector Garcia. (See Hr'g Tr. 118:7-11.) Romero failed to provide officers any documentation showing he lawfully possessed the vehicle. (*Id.* at 122:15-19.)

Montoya then began handling the backpack and asked Romero, "Is this your backpack, this black one?" (Gov.'s Ex. 6 at 8:26-8:30.) Defendant said "no." (*Id.* at 8:30-8:37.) Montoya asked whose backpack it was, and Defendant said, "I don't know." (*Id.* at 8:37-8:42.) While Montoya was asking these questions, he removed a small safe from the backpack. (*Id.* at 8:42-8:58.) Montoya continued to ask questions about where it came from, and Defendant said "It has to be from my buddy's house. I don't know where it came from." (*Id.* at 8:58-9:04.) He held up the safe and asked Defendant, "Is this your buddy's?" (*Id.* at 9:14-9:17.) Defendant said, "It's not mine. I don't know." (*Id.* at 9:25-9:27.) Montoya was able to open the safe by pressing his thumbs on it,

without requiring a code. (*See* Hr'g Tr. 26:17-27:7.) Montoya saw within it a firearm and blue pills. (*See id.* at 26:18-27:10; Gov.'s Ex. 6 at 10:20-11:27.)

After Montoya saw the contents of the safe, the investigation changed, and Montoya determined they should seal the vehicle and obtain a search warrant. (Hr'g Tr. 27:13-17, 123:13-17.) Montoya asked Romero to turn around and put his hands behind his back. (*See* Gov.'s Ex. 6 at 9:25-10:55.) Simmons put handcuffs on Romero. (*Id.*; Hr'g Tr. 123:2-7.) Montoya explained to another officer that he would search incident to tow, Romero wasn't taking ownership of the backpack, he looked inside for valuables, and he found a gun and pills. (*See id.* at 10:55-11:27.) They discussed sealing the vehicle and the potential charges, including checking to see if he has been convicted of a felony. (*See id.* at 10:55-13:16.) He did not have a felony. (Hr'g Tr. 51:8-13.) According to APD policy, if an inventory search reveals narcotics or a firearm, officers cannot leave those items in the vehicle and, for narcotics, the officers should seal the vehicle and obtain a search warrant. (*See id.* at 21:15-22:6.) Officers ended up sealing the vehicle that night while they obtained a search warrant, and they drove Romero home. (*Id.* at 30:22-25.) Simmons issued Romero citations for No Insurance, Suspended Driver's License, and Failing to Yield to Emergency Equipment. (*See* Hr'g Tr. 121:12-21; Def.'s Ex. C.) Simmons also cited Romero for "Improper turning at intersection" in violation of N.M. Stat. Ann. § 66-07-322. (*See* Hr'g Tr. 130:3-132:19; Def.'x Ex. C.)

Simmons filled a APD Tow-In Report, but instead of listing items found, he stated "Vehicle to be held for search warrant." (Def.'s Ex. U; Hr'g Tr. 61:11-62:14.) On March 2, 2021, Simmons submitted an affidavit for a state warrant to search for, among other things, firearms and controlled substances, and it was signed by a state court judge. (*See* Def.'s Ex. V at 1, 4; Hr'g Tr. 123:18-124:4.) After explaining the officers' observations of Romero in the parking lot, his initial failures

to stop in response to emergency equipment, and his lack of documents required to operate a vehicle, Simmons stated:

> The decision was made to tow his vehicle. While conducting the search incident to tow, a black backpack was observed in the back seat behind the driver side. *Within the black back pack was a black lock box that was ajar*. A black small compact handgun was observed inside the box along with a large clear bag of what appeared to be small blue pills…

(Def.'s Ex. V at 3 (italics added).) Simmons' statement about the box being ajar was based on what Montoya told him he observed. (*See* Hr'g Tr. 37:11-23, 65:2-11.) The safe, however, was closed when Montoya first saw it and it was not ajar until after Montoya opened the backpack and the safe. (*See id.* at 37:24-38:3, 43:19-44:1, 70:4-12.) Simmons later executed the search warrant and seized a firearm, methamphetamine, heroin, and fentanyl pills. (*See id.* at 124:5-24.)

## II.     ANALYSIS

The United States first argues that Romero has no standing to challenge the search of the car or the backpack, because he has shown no lawful right to the vehicle from the car's owner, and he expressly disclaimed any ownership interest in the backpack, thus abandoning it. The Court will first address the issue of standing before turning to the merits of Defendant's arguments for suppression.

### A.  Whether Romero has standing to challenge the search of the car and backpack

Fourth Amendment rights are personal, so a defendant may only challenge a search or seizure when his own Fourth Amendment rights have been violated. *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009). To determine if a defendant has a protectable privacy right under the Fourth Amendment, courts consider (1) if the person manifested a subjective expectation of privacy in the object of the challenged search, and (2) if society is willing to recognize that expectation as reasonable. *United States v. Jefferson*, 925 F.2d 1242, 1248 (10th Cir. 1991).

Property concepts are instructive on whether privacy interests are reasonable, but privacy rights need not be based on a common-law interest in property. *Byrd v. United States*, 138 S.Ct. 1518, 1526 (2021). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (citations and quotation marks omitted).

When a defendant moves to suppress evidence found in a car in which he is not the registered owner, the defendant must establish "that he gained possession from the owner or someone with authority to grant possession." *Id.* (citations and quotation marks omitted). Stated differently, a "defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner." *Id.* at 1275. In analyzing whether the defendant carried his burden for the necessary link, the court considers the following non-dispositive factors: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Id.* at 1274-75 (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir.2000)). Because the focus is on reasonable expectations, a defendant does not need to submit legal documentation showing a chain of lawful custody from the registered owner to himself. *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003).

As for the first factor, Romero asserted ownership of most of the items seized from the car, but not the backpack or safe. With respect to the second factor, Romero did not testify to his expectation of privacy at the suppression hearing. Turning to the third factor, Romero argues that he had possession of the car and its legal title and he told officers he was buying it from a friend. Furthermore, Romero contends that there was no evidence that the car was stolen. Romero relies

on *Byrd v. United States*, 138 S.Ct. 1518 (2021), in which the Supreme Court held that a driver in lawful possession or control of a rental car, but who is not listed on the rental agreement as an authorized driver, has a reasonable expectation of privacy in the car. *See id.* at 1523-24, 1531. *Byrd*, however, is sufficiently distinguishable from this case to be of limited utility.

While possessing the title and car are factors in Romero's favor, he must show that he was in lawful possession of the car via a link to its registered owner or provide "evidence showing that he reasonably believed that the lender was 'someone with authority to grant possession.'" *Valdez Hocker*, 333 F.3d at 1209. The car was registered and titled to Hector Garcia. Romero presented evidence at the hearing through a defense investigator who procured a Declaration from Isaac Lopez who swore under penalty of perjury that he purchased the vehicle from Hector Garcia Salas and sold it to Romero. (*See* Def.'s Ex. B ¶¶ 2-3.) Defendant has thus presented some hearsay evidence that he was in lawful possession of the car with a link to the registered owner. *Cf. Valdez Hocker*, 333 F.3d at 1209-11 (holding that defendant had reasonable expectation of privacy in vehicle, even though defendant borrowed car from Savala, who was not registered owner, because defendant testified that he presumed that she owned car, and that if she didn't, it was only because she had not yet purchased it from her cousin, that she had used car as her own during the entire week of defendant's visit, and kept it at her home address, and defendant knew the registered owner personally). Although the Government objected to the Court's reliance on this evidence, hearsay evidence is admissible at suppression hearings. *See United States v. Sanchez*, 555 F.3d 910, 922 (10th Cir. 2009). The Court has some concerns about the reliability of the sworn declaration, given that Mr. Lopez did not testify subject to cross examination. Nevertheless, based on the evidence, the Court will assume without deciding that Romero has a reasonable expectation of privacy in the vehicle.

Romero, however, expressly disavowed ownership of the backpack, so the Government asserts that he abandoned it. Romero contends that the search of the backpack "is subsumed within the illegal search of the vehicle" and that he denied the backpack was his as "a reaction to the overwhelming arrest and illegal search and not a product of his own voluntary will." (Def.'s Reply 7, ECF No. 34.)

When a person voluntarily abandons property, he forfeits any expectation of privacy in it that he might have had. *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983). Using objective standards based on words, acts, or other objective facts, the test for abandonment "is whether an individual has retained any reasonable expectation of privacy in the object." *Id.* That there is a police investigation at the time of abandonment does not of itself render the abandonment involuntary. *Id.* Cases in which the Tenth Circuit has found abandonment "involved a situation where the defendant either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment." *United States v. Garzon*, 119 F.3d 1446, 1452 (10th Cir. 1997). The Government bears the burden by a preponderance of the evidence to show abandonment. *See United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006) (citing *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir.2003)).

Here, Defendant admits that he said the backpack was not his and the video confirms he said it was not his backpack. (*See* Def.'s Reply 7, ECF No. 34; Gov.'s Ex. 6 at 8:26-9:27.) Although he was the only person in the car, he told officers the car was his buddy's and that the backpack could be from his buddy's house. Whether a defendant harbors a desire to retain possession or retrieve an object is irrelevant to the analysis of the objective component for the abandonment test, because even where a suspect does not subjectively intend to relinquish all ownership interest in an item, such suspect may nevertheless relinquish his or her reasonable

expectation of privacy in the item. *Denny*, 441 F.3d at 1227. Based on the video and Tenth Circuit law, Romero explicitly disclaimed an interest in the object. *Cf. id.* at 1229 ("We conclude the district court erred to the extent it concluded Defendant, once he expressly disclaimed any ownership interest in the plastic bag and its contents, maintained an expectation of privacy therein which society would accept as reasonable. Because Defendant abandoned the plastic bag and its contents, he had no standing to object to Agent Dorian's search of the cracker box."); *Jones*, 707 F.2d at 1172-73 (holding defendant voluntarily abandoned satchel when he discarded it and repeatedly disavowed any knowledge of satchel to police).

As for Defendant's argument that his disclaimer was involuntary, the officers did not use unduly coercive measures that forced Romero to abandon the backpack. Although there were multiple officers at the scene, Romero was not handcuffed at the time he disclaimed ownership, and the interaction was cordial. However, it is a close question as to whether Romero voluntarily disclaiming an interest in the backpack negates his standing to challenge the search of the backpack. The Court need not definitively resolve this issue, because even presuming Defendant has standing, Defendant's motion will be denied on the merits for the reasons given herein.

**B. The officers had reasonable suspicion to support their investigative detention of Defendant**

An investigative detention is an exception to the probable cause requirement whose reasonableness is determined by a two-part test: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the detention in the first place. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)).

**1. The initial stop was reasonable and justified**

For reasonable suspicion to exist, the officer must have "some minimal level of objective

justification for making the stop," and evidence "falling considerably short of a preponderance satisfies this standard." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (quotations and citations omitted). The Government asserts it had reasonable suspicion to stop Defendant for (1) driving a stolen vehicle; (2) failing to pull over in response to emergency equipment, in violation of N.M. Stat. Ann. § 66-7-332; (3) failure to use a turn signal in violation of N.M. Stat. Ann. § 66-7-322; and (4) suspended insurance in violation of N.M. Stat. Ann. § 66-5-205 and -229(c). (Gov.'s Resp. 12-13, ECF No. 31.) Defendant argues that failing to use his turn signal when turning onto Coors from a private parking lot does not justify a traffic stop. He also contends that officers had no cause to detain him for failing to respond to emergency lights because neither he nor a reasonable driver would know he needed to pull over where officers turned them off shortly after he drove away.

The Court finds that officers had reasonable suspicion to investigate Defendant for auto theft at the time they attempted to detain him at the Mariscos parking lot. His behavior under the steering column given the time of night and the high crime area was suspicious. The fact that he drove away when the three police cars activated their lights and sirens behind him only added to their suspicions of illegal activity. Furthermore, Romero failed to pull over in response to the emergency vehicles in both the parking lot and later when Simmons attempted to pull him over on Coors, creating an alternative ground for an investigative detention for failure to pull over for emergency vehicles.[2] By the time Romero pulled over, officers also had reasonable suspicion to stop him for driving an uninsured vehicle. The initial stop of Defendant was therefore reasonable

---

[2] *See* N.M. Stat. Ann. § 66-7-332(A) ("Upon the immediate approach of an authorized emergency vehicle displaying flashing emergency lights or when the driver is giving audible signal by siren, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in that position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.").

and constitutional.[3]

### 2.  Officers' continued detention of Romero was reasonable in scope

An investigative detention may only last as long as necessary to effectuate the purpose of the stop. *See Florida v. Royer*, 460 U.S. 491, 500 (1983). The scope of the detention must be carefully tailored to its underlying justification. *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003). It is the Government's burden to show that a seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative detention. *Royer*, 460 U.S. at 500.

During a routine traffic stop, an officer may ask questions, examine documentation, run computer checks of the vehicle, ask about travel plans, and issue citations. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001). An officer may also examine the VIN on the dashboard, doorjamb, or both if he remains physically outside the car. *United States v. Chavira*, 467 F.3d 1286, 1289 n.1 (10th Cir. 2006). Questioning, even unrelated to the purpose of the stop, including asking about illegal items, does not offend the Fourth Amendment so long as it does not appreciably lengthen the detention. *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007) (citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006)).

Defendant argues that officers were obligated to end their investigation and release Romero after they determined his license was suspended and the car was uninsured. Here, the total investigative detention was short in duration. They had reason, however, to investigate whether

---

[3] As for Romero's failure to use a signal when turning onto Coors, Simmons relied on N.M. Stat. Ann. § 66-7-322, which applies for turning at an intersection. This section thus may not be applicable to the situation in which Romero made a turn onto Coors from a private parking lot. However, Section 66-7-325(A) arguably might apply to this situation. See N.M. Stat. Ann. § 325(A) ("No person shall … otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other traffic may be affected by such movement."). The parties, however, did not address alternative statutory bases for Simmons' citation based on failure to use a turn signal. Because numerous other grounds exist to find that officers had reasonable suspicion to detain Romero, this Court need not determine whether officers also had reasonable suspicion to stop him for failure to make a proper turn signal.

Romero was in lawful possession of the car and, as discussed below, to impound the car. The detention was not unreasonably long for its purpose.

### C. Montoya's search of the vehicle, backpack, and safe were lawful based on an inventory search pursuant to impoundment procedures

Defendant argues that it was unlawful for Detective Montoya to open the rear driver's side door and manipulate the contents of the backpack, and to bring out the safe and open it at the scene. Defendant cites APD Standard Operating Procedure ("SOP") 2-71-3, F(1)(f) that limits the scope of a search incident to arrest to exclude containers in the car if the person is removed from the car. (*See* Def.'s Am. Mot. 20-21, ECF No. 28.) The Government, however, is not relying on a search-incident-to-arrest theory and instead relying on an impoundment theory.

The Government argues the search of the car was lawful pursuant to impoundment and inventory procedures, as Defendant was driving a vehicle while his license was suspended, and he had no insurance for the vehicle. According to the Government, for the same reasons, the contents of the car would have been inevitably discovered, regardless of Detective Montoya's opening the door and looking inside with a flashlight. Defendant, however, argues that impoundment was a pretext for conducting an illegal warrantless search.

An inventory search is a well-defined exception to the warrant requirement. *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). An inventory search of a lawfully impounded automobile pursuant to standard police procedures is reasonable even if it is conducted without a warrant and in the absence of probable cause based on the community care taking function. *See id.* at 369-73; *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) ("inventory searches need not be supported by a warrant or probable cause."). "It is common practice for the police to

conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." *Tueller*, 349 F.3d at 1243 (quotation omitted).

Because inventory searches are justified by their administrative purposes, such searches (1) "are reasonable only if conducted according to standardized procedures," and (2) the "policy or practice governing inventory searches should be designed to produce an inventory." *Id.* at 1243 (citations and quotation marks omitted). An inventory search cannot be a ruse for a general search to discover incriminating evidence. *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). The government has the burden of demonstrating reasonableness. *United States v. Taylor*, 592 F.3d 1104, 1107 (10th Cir. 2010); *see also United States v. Sanders*, 796 F.3d 1241, 1244 (10th Cir. 2015) ("The government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment."). If agents act in bad faith or solely for the purpose of investigation, evidence may be suppressed. *See Taylor*, 592 F.3d at 1108.

As to the first prong – whether officers acted according to standardized criteria – APD has a towing and impoundment policy, and the policy permits impoundment if the vehicle does not have insurance. Officers had evidence the vehicle was uninsured prior to Romero finally pulling over, and his failing to provide them any insurance documents further supported their belief the car was uninsured. Because the car was not insured, impounding the vehicle and searching its contents for inventory purposes was in accordance with APD policy.

Defendant nevertheless argues that the decision to tow the car was unreasonable because officers could have contacted the owner to take custody of it. Defendant urges the Court to follow *United States v. Sanders*. In *Sanders*, the Tenth Circuit held "that impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-

18

pretextual community-caretaking rationale." *Id.* at 1248. The Tenth Circuit explained its basis for imposing "heightened requirements on police who seize vehicles from private property," distinguishing the case from those in which "a vehicle is obstructing or impeding traffic on public property," when "it can be impounded regardless of whether the impoundment is guided by standardized procedures." *Id.* at 1249. In determining the lawfulness of impoundment, the Tenth Circuit listed five non-exhaustive factors to consider:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Id.* at 1250.

Unlike in *Sanders*, here the car was on public property and the car was not insured. Officers followed standardized police procedures in deciding to impound the uninsured car. The car also posed a potential hazard to traffic on a busy public street at night because it was parked on the shoulder less than a foot from a highly trafficked road with a 45-mph speed limit. Although the car was not blocking traffic, it was not in a marked parking space and there were reasons to be concerned that it was not in a safe spot, especially at night. Moreover, it was not clear who owned the car, so the ability to find an alternative suitable driver was not immediately apparent. The officers had reasonable, non-pretextual community caretaking rationales for impounding the car. The Tenth Circuit has approved the legality of an impoundment in similar circumstances. *Cf. United States v. Trujillo*, 993 F.3d 859, 864 (10th Cir. 2021) ("When an unoccupied vehicle would impede traffic and the registered owner cannot readily arrange for someone to drive it away, law-enforcement officers may impound the vehicle."); *United States v. Haro-Salcedo*, 107 F.3d 769, 771-74 (10th Cir. 1997) (impoundment reasonable where neither driver or passenger could prove

ownership of vehicle with suspicious license plate, and thus a proper inventory search would have uncovered cocaine in the trunk of his vehicle); *United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992) (impoundment proper where defendant, traveling alone, was arrested, so even assuming that post-arrest search beside highway was improper and should have been conducted in different manner, had search been conducted in manner defendant suggests is proper, it was inevitable that weapons would have been discovered).[4]

Defendant also argues that impoundment was just a ruse to search the car for contraband. *Cf. United States v. Edwards*, 632 F.3d 633, 644 (10th Cir. 2001) (finding that inventory search of vehicle was a ruse where decision to impound car was not made until after search revealed incriminating evidence and officer testified that he was searching for evidence of a crime). That an officer may be motivated in part by an investigative motive is not enough to require suppression, so long as investigation is not the sole motive. *Trujillo*, 993 F.3d at 871. A "dual motive does not invalidate an otherwise lawful impound and inventory." *Id.* (quoting *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018) (unpublished)). Because the officers had reasonable grounds for impounding the vehicle prior to searching the safe, the search was valid despite any dual motives. Once he learned the car was uninsured, Simmons believed they would need to tow the vehicle. Moreover, Montoya informed Romero that they were going to impound the vehicle shortly after learning that Romero's license was suspended. While he did not say aloud that officers were going to tow the vehicle before looking into the backpack, the circumstances are such that the officers had valid reasons for impounding the vehicle and they were motivated to impound the car

---

[4] Moreover, as for making alternative arrangements, officers are not required to allow a solo driver to call someone to come pick up the car and then, assuming he was successful, wait around for the new driver to arrive. *See Trujillo*, 993 F.3d at 870 (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 (1987), for proposition that the "real question is not what could have been achieved, but whether the Fourth Amendment requires such steps ... [.] The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means.")).

because of the lack of insurance and a driver's license. Significantly, Montoya did not find contraband prior to telling Romero they were going to impound the car. The Court is thus not persuaded that the officers were using impoundment solely as a ruse to rummage through the car.

Here, APD had pre-existing rules requiring the inventory search of an impounded vehicle. This same policy authorized the inventory search of the entire vehicle, including containers. Established police department policies requiring the opening of all containers are "unquestionably permissible." *Florida v. Wells*, 495 U.S. 1, 4 (1990). *See also Colorado v. Bertine*, 479 U.S. 367, 369, 375 (1987) (holding that officers may open closed containers while conducting an inventory search of an impounded vehicle, including opening a closed backpack, a bag within the backpack, and closed metal canisters located inside the bag).

The second factor to determine the lawfulness of an inventory search is whether the policy or practice was designed to produce an inventory. Here, no administrative inventory was created, because when officers discovered the firearm and drugs at the scene, they decided to apply for a search warrant. Even if officers erred by not completing a detailed inventory report, the evidence would have been inevitably discovered. *Cf. Tueller*, 349 F.3d at 1241 (holding that search, performed with assistance of drug-detection dog, was lawful because "if the officers had not used the dog, the evidence would still have been discovered in the course of a lawful inventory search that would inevitably have been conducted"); *Horn*, 970 F.2d at 732 ("Even assuming arguendo that the post-arrest search beside the highway was improper and should have been conducted in a different manner, … it was inevitable that the weapons would have been discovered … [so] this evidence is admissible.").

In sum, officers had grounds to impound and inventory the vehicle when they learned Romero did not have insurance and again when they learned he did not have a driver's license.

Their search of the vehicle, backpack, and safe was therefore constitutional.[5]

**D.      Romero's *Miranda* rights were not violated**

Police must give *Miranda* warnings when the suspect is in "custody" and the questioning amounts to "interrogation." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). The relevant inquiry for determining whether an individual is "in custody" is whether a person in that position would reasonably believe his freedom of action "had been curtailed to a 'degree associated with a formal arrest.'" *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983), and *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). The questioning that occurs during a routine traffic stop generally requires no *Miranda* warnings because these everyday police-motorist encounters are brief, non-threatening, and conducted in the presence of others. *See Berkemer*, 468 U.S. at 437–39. Nevertheless, "law enforcement officials may create the custodial interrogation that *Miranda* contemplates 'by employing an amount of force that reache[s] the boundary line between a permissible *Terry* stop and an unconstitutional arrest.'" *United States v. Curls*, 219 F. App'x 746, 754 (10th Cir. 2007) (quoting *Perdue*, 8 F.3d at 1464)). As the *Berkemer* Court explained, if "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." 468 U.S. at 440.

The test for determining whether a roadside traffic stop amounts to a custodial interrogation

---

[5] The Court is not convinced that Montoya searched inside the backpack before officers had grounds to impound the vehicle. Simmons learned the vehicle had no insurance before Romero finally stopped, and Simmons asked for Romero's insurance documents very shortly after approaching him, and Romero did not produce any. Once he learned the car was uninsured, Simmons believed they would need to tow the vehicle. Even if Montoya had not yet subjectively decided to tow the vehicle when he first opened the door or touched the backpack, officers would have inevitably discovered the items in an inventory search. "When evidence is obtained in violation of the Fourth Amendment, that evidence need not be suppressed if agents inevitably would have discovered it through lawful means independent from the unconstitutional search." *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019).

subject to *Miranda* is whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.* at 437. Avoiding "hard line rules," the Tenth Circuit has instead considered numerous factors to determine whether a suspect is in custody. *Griffin*, 7 F.3d at 1518. The first factor is "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (quoting *Griffin*, 7 F.3d at 1518). Second, "the nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* (quoting *Griffin*, 7 F.3d at 1518). Third, the court uses "the following helpful guideposts" to "check whether police dominate the encounter":

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* (quoting *Griffin*, 7 F.3d at 1518-19).

Here, Defendant was surrounded by numerous officers and was initially pat-down for weapons, but he was in a public place, and officers did not display weapons, make any threats, or handcuff him until after the discovery of the firearm and drugs. Officers used a cordial tone, and ultimately, they took him home that night without arresting him. Romero was not in the functional equivalent of formal arrest, and thus, officers did not need to *Mirandize* him before questioning him while he was inside his car and standing outside his car prior to placing him in handcuffs. *Cf. United States v. Cortez*, 965 F.3d 827, 841 (10th Cir. 2020) (concluding that defendants were not in custody, and thus did not require *Miranda* warnings, because officer used polite questioning during non-threatening 20-minute traffic stop and did not use physical restraints or display a

firearm); *Eckhart*, 569 F.3d at 1276 (holding that officer did not violate Fifth Amendment by questioning defendant without *Miranda* warnings during traffic stop where officers never handcuffed defendant, nor placed him in a police cruiser, nor drew weapons, and they were polite in their demeanor and did not use or threaten use of force at any time).

### E.  The search warrant is valid

If information found during an unconstitutional search is used to obtain a search warrant, the evidence seized pursuant to the warrant would be inadmissible as fruit of the poisonous tree. *See United States v. Hatfield*, 333 F.3d 1189, 1193-94 (10th Cir. 2003). Defendant argues that the search warrant was based on evidence discovered in an unlawful search and that officers misrepresented to the judge that the search was part of an inventory. Because the impoundment was proper and, thus, any evidence in the car was lawfully discovered pursuant to a valid inventory search, the warrant based on the evidence found in the car is likewise valid.

Defendant also argues that the affidavit supporting the warrant contained material misrepresentations. Defendant asserts that Simmons omitted that the car was searched two times on the evening of the arrest – once at the beginning of the arrest before officers decided to impound the car and again after they decided to impound the car when they located the contraband. Montoya admitted at the hearing that the black lock box was not ajar when he first found it, yet the affidavit stated that within the backpack "was a black lock box that was ajar."

It is a violation of the Fourth Amendment for an affiant to knowingly and intentionally, or with reckless disregard for the truth, include false statements or make material omissions in an affidavit supporting a search warrant. *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001) (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)).  A defendant must satisfy a two-prong test to be entitled to a *Franks* hearing and suppress fruits of the search: (1) that a false statement

was knowingly, intentionally, or recklessly included in the affidavit or that a material omission was knowingly, intentionally, or recklessly excluded from the affidavit; and (2) the false statement was necessary to a finding of probable cause or the omission, if included, would have negated probable cause. *See id.* As the Supreme Court explained in *Franks*, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72.

Even assuming that the statement concerning the safe being ajar was false and knowingly or recklessly made, Defendant has not satisfied the second element to suppress evidence – that the false statement was necessary to a finding of probable cause. Simmons averred in the affidavit that the decision was made to tow the vehicle, and that during the search incident to tow, officers found a black lock box within a black backpack. Those statements were accurate, and from those statements, the approving judge would have been aware that the officers could open even the closed black lock box. While Simmons' statement that the black lock box was ajar in the backpack was inaccurate, that misrepresentation was immaterial. It was clear from the affidavit that officers were searching containers within the vehicle pursuant to impoundment and they were permitted to search containers therein because they had evidence that the vehicle was not insured. Montoya was able to open the safe without a code. Whether the lockbox was ajar or closed was immaterial because officers were constitutionally permitted to search its contents based on the inventory search doctrine. That the officers lawfully discovered the pills within the lockbox gave them probable cause to support a search warrant of the vehicle. The later search of the vehicle pursuant to the warrant was therefore lawful as well.

**IT IS THEREFORE ORDERED** that Defendant Eloy Romero's *Motion to Suppress*

*Evidence due to Violation of the Fourth Amendment and/or after an Illegal Inventory and Impounding and Search of Mr. Romero's Vehicle* (**ECF No. 26**) and his *Amended Motion to Suppress Evidence due to Violation of the Fourth Amendment and/or after an Illegal Inventory and Impounding and Search of Mr. Romero's Vehicle* (**ECF No. 28**) are **DENIED**.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**